UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RIGHT TO LIFE OF CENTRAL CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>Defendant. | No.  1:21-cv-01512-DAD-SAB<br><br><br>ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER<br><br>(Doc. No. 11) |

This matter came before the court on October 28, 2021 for a hearing on the motion for a temporary restraining order filed on behalf of plaintiff Right to Life of Central California ("Right to Life" or "plaintiff") on October 20, 2021.  (Doc. No. 11.)  Attorney Kevin Hayden Theriot appeared by video for plaintiff.  Deputy Attorney General Kristin A. Liska and Deputy Attorney General Rita B. Bosworth appeared by video on behalf of defendant Rob Bonta, in his official capacity as Attorney General of the State of California.  For the reasons explained below, the court will grant plaintiff's motion for a temporary restraining order, in part.

**BACKGROUND**

On October 13, 2021, plaintiff filed a verified complaint against defendant seeking to enjoin enforcement of SB 742, a California urgency statute that became effective October 8, 2021

1   and is codified in California Penal Code § 594.39, which makes it

> unlawful to knowingly approach within 30 feet of any person while a person is within 100 feet of the entrance or exit of a vaccination site and is seeking to enter or exit a vaccination site, or any occupied motor vehicle seeking entry or exit to a vaccination site, for the purpose of obstructing, injuring, harassing, intimidating, or interfering with that person or vehicle occupant.

(Doc. No. 1 at ¶¶ 5, 56–58) (quoting Cal. Penal Code § 594.39(a)).  Plaintiff alleges that because SB 742 defines "harassing" as used in the provision as "knowingly approaching, without consent, within 30 feet of another person or occupied vehicle for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with, that other person in a public way or on a sidewalk area," SB 742 violates plaintiff's rights under the First and Fourteenth Amendments to the U.S. Constitution.  (Doc. No. 1 at ¶¶ 60, 83.) Specifically, plaintiff asserts the following five causes of action in its complaint:  (1) a First Amendment freedom of speech claim; (2) a First Amendment free exercise of religion claim; (3) a Fourteenth Amendment equal protection claim; (4) a Fourteenth Amendment procedural due process claim; and (5) a First Amendment expressive association claim.  (*Id.* at 11–18.)

On October 20, 2021, plaintiff filed the pending motion for a temporary restraining order, requesting that the court temporarily enjoin "defendant and any person acting in concert with him from enforcing SB 742:  (a) facially, against any speaker, and (b) as applied to the constitutionally protected activities of plaintiff and its agents, including their rights to engage in peaceful advocacy and association on public and private property."  (Doc. No. 11 at 2.)

/////

/////

/////

/////

/////

/////

/////

/////

2

Plaintiff's motion is based on the facts alleged in its verified complaint,[1] as well as the declaration of John Gerardi, the Executive Director at Right to Life.  (Doc. No. 11-2.)  On October 25, 2021, defendant filed his opposition to the pending motion and a declaration by Deputy Attorney General Liska in support of that opposition.  (Doc. Nos. 15, 15-1.)  Plaintiff filed its reply thereto on October 26, 2021.  (Doc. No. 17.)

Based on the evidence that the parties have submitted to the court, the relevant facts are summarized as follows.

**A.**      **SB 742 and California Penal Code § 594.39**

In enacting SB 742, the California Legislature stated that "it is the intent of the Legislature to protect Californians from infectious diseases by safeguarding their right to access vaccination sites and ensuring that Californians can lawfully protest."  2021 Cal. Legis. Serv. Ch. 737 (West). The Legislature stated that SB 742 "is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the

---

[1]  "Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit."  Fed. R. Civ. P. 11.  Federal Rule of Civil Procedure 65, which governs injunctions and restraining orders, provides that

> [t]he court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:  (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and . . ..

Fed. R. Civ. P. 65(b)(1).  Here, because plaintiff provided defendant with notice of the pending motion (*see* Doc. No. 11-3), plaintiff's complaint did not need to be verified in order to obtain the temporary restraining order it seeks.  Nevertheless, plaintiff's verified complaint, which is supported by the declaration of plaintiff's Executive Director John Gerardi (*see* Doc. Nos. 1 at 23; 11-2 at ¶ 4), may be treated by the court as an affidavit.  *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985) ("A verified complaint may be treated as an affidavit to the extent that the complaint is based on personal knowledge and sets forth facts admissible in evidence and to which the affiant is competent to testify.").  Defendant has not submitted any counter-affidavits that substantially controvert the factual allegations in plaintiff's verified complaint.  Thus, the factual allegations in the verified complaint may serve as the basis for plaintiff's motion for a temporary restraining order.  *See McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("There is no disputing that an affidavit and a complaint may be the basis for a preliminary injunction unless the facts are substantially controverted by counter-affidavits."); *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011), *overruled on other grounds*, *Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195 (9th Cir. 2019); *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088–89 (9th Cir. 1972).

California Constitution and shall go into immediate effect," and stated specifically that "[i]n order to ensure public peace and safety during the process of distributing vaccinations during the ongoing COVID-19 pandemic and public health crisis, it is necessary for this measure to go into immediate effect." *Id.* § 4. The Legislature also made the following findings and declarations:

> (1) On March 4, 2020, Governor Gavin Newsom declared a state of emergency in California due to the threat posed by the novel coronavirus (COVID-19) pandemic.
>
> (2) The COVID-19 pandemic has resulted in the tragic death of over 640,000 Americans, including over 65,000 Californians.
>
> (3) COVID-19 is increasingly infecting Californians' children and preventing them from learning and attending school.
>
> (4) The federal Centers for Disease Control and Prevention (CDC) stated that one of the principal ways that SARS–COV–2, the virus that causes COVID-19, is spread is through inhalation of very fine respiratory droplets and aerosol particles.
>
> (5) Preeminent virologists, epidemiologists, and medical journals have all recognized that SARS–COV–2 can spread through aerosol transmission over multiple feet.
>
> (6) The CDC recently told the public that the Delta COVID-19 variant, B.1.617.2, AY.1, AY.2, AY.3, is one of the most infectious and easily transmitted respiratory viruses ever.
>
> (7) Preeminent virologists, epidemiologists, and medical journals have also recognized that other infectious diseases, including measles, chickenpox, and tuberculosis, all spread through airborne transmission.
>
> (8) Future unknown infectious diseases also likely will spread through airborne transmission.
>
> (9) To blunt and stop infectious diseases, the State of California has an overwhelming and compelling interest in ensuring its residents can obtain and access vaccinations.
>
> (10) The United States Supreme Court previously upheld a buffer zone protecting patients right to access healthcare services.
>
> (11) Given the distance across which airborne infectious diseases spread, a 30–foot buffer zone is necessary to protect the health of Californians trying to access vaccination sites.
>
> (12) Protestors at vaccination sites continue to impede and delay Californians' ability to access vaccination sites.

/////

4

1   *Id.* § 1(a).  The Legislature enrolled and presented SB 742 to the Governor on September 13,

2   2021.  *See* 2021 Cal. Senate Bill No. 742, California 2021–2022 Regular Session, Bill Tracking.

3          On October 8, 2021, Governor Newsom approved SB 742, effective immediately.  *Id.*  As

4   noted above, SB 742 added § 594.39 to the California Penal Code, making it

5                    unlawful to knowingly approach within 30 feet of any person while
                     a person is within 100 feet of the entrance or exit of a vaccination
6                    site and is seeking to enter or exit a vaccination site, or any occupied
                     motor vehicle seeking entry or exit to a vaccination site, for the
7                    purpose of obstructing, injuring, harassing, intimidating, or
                     interfering with that person or vehicle occupant.
8

9   Cal. Penal Code § 594.39(a).  A violation of this law "is punishable by a fine not exceeding one

10  thousand dollars ($1,000), imprisonment in a county jail not exceeding six months, or by both

11  that fine and imprisonment."  *Id.* § 594.39(b).  Section 594.39(d) states that "[i]t is not a violation

12  of this section to engage in lawful picketing arising out of a labor dispute, as provided in Section

13  527.3 of the Code of Civil Procedure."[2]  *Id.* § 594.39(d).

14         Section 594.39 defines some terms appearing in the statute but not others.  "Vaccination

15  site" is defined as "the physical location where vaccination services are provided, including, but

16  not limited to, a hospital, physician's office, clinic, or any retail space or pop-up location made

17  available for vaccination services;" notably, this definition encompasses vaccines **of any type**,

18  _____

19  [2]  Section 527.3 of the Code of Civil Procedure governs the scope of "the equity jurisdiction of
    the courts in cases involving or growing out of a labor dispute," recognizing the Legislature's
20  intent "to promote the rights of workers to engage in concerted activities for the purpose of
    collective bargaining, picketing or other mutual aid or protection, and to prevent the evils which
21  frequently occur when courts interfere with the normal processes of dispute resolution between
    employers and recognized employee organizations."  Cal. Civ. Proc. Code § 527.3.  In that
22  context, § 527.3 provides that courts shall not have jurisdiction to enjoin persons from:

23                   (1) Giving publicity to, and obtaining or communicating information
                     regarding the existence of, or the facts involved in, any labor dispute,
24                   whether by advertising, speaking, patrolling any public street or any
                     place where any person or persons may lawfully be, or by any other
25                   method not involving fraud, violence or breach of the peace.

26                   (2) Peaceful picketing or patrolling involving any labor dispute,
                     whether engaged in singly or in numbers.
27

28  Cal. Civ. Proc. Code § 527.3(b).  The terms "[l]awful picketing," "peaceful picketing," and
    "picketing" are not defined in § 527.3.

not just COVID-19 vaccines.  *Id.* § 594.39(c)(6).  "Harassing" is defined in the statute as "knowingly approaching, without consent, within 30 feet of another person or occupied vehicle for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with, that other person in a public way or on a sidewalk area."  *Id.* § 594.39(c)(1).  "Interfering with" is defined as "restricting a person's freedom of movement." *Id.* § 594.39(c)(2).  "Intimidating" is defined as "making a true threat directed to a person or group of persons with the intent of placing that person or group of persons in fear of bodily harm or death."  *Id.* § 594.39(c)(3).  "Obstructing" is defined as "rendering ingress to or egress from a vaccination site, or rendering passage to or from a vaccination site, unreasonably difficult or hazardous."  *Id.* § 594.39(c)(4).  Section 594.39, however, provides no definition of "knowingly approach," "knowingly approaching," or "picketing" as those words are used in the statute.

Section 594.39 includes a severability clause, which states that "[t]he provisions of this section are severable.  If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application."  *Id.* § 594.39(e).

**B.      Plaintiff Right to Life's Expressive Activity**

Plaintiff "Right to Life is a nonprofit organization serving women facing unplanned pregnancies or suffering the grief of abortion by providing outreach, material support, educational resources, medical care, and counseling."  (Doc. No. 1 at ¶ 11.)  Right to Life's outreach efforts are designed to further its charitable mission "to (i) engage its community by presenting the pro-life position with clarity and compassion, (ii) equip advocates to defend the sanctity of all human life through effective tools and training, and (iii) embrace individuals facing an unplanned pregnancy and those hurt by abortion."  (*Id.* at ¶¶ 12, 14.)  Right to Life is motivated by its biblical beliefs.  (*Id.* at ¶¶ 13, 16.)

"Right to Life's primary means of outreach to women considering abortion is through its Outreach Center" in Fresno, California (the "Outreach Center"), which is located next to a Planned Parenthood abortion clinic (the "Planned Parenthood clinic") that offers vaccinations against human papillomavirus ("HPV"), not vaccinations against COVID-19.  (*Id.* at ¶¶ 26, 28,

77–78.)  The Outreach Center's parking lot is adjacent to the Planned Parenthood clinic's parking lot, and the sidewalk in front of the Outreach Center and the Planned Parenthood clinic is contiguous.  (*Id.* at ¶¶ 32–33.)  "Right to Life's outreach to women considering abortion primarily occurs through sidewalk advocacy on the public walkways in front of the Outreach Center, and between the Outreach Center and [the] Planned Parenthood [clinic]" and "involves speaking kindly and peacefully with others at a normal conversational distance, to share its free resources and support services," and "displaying signs and offering informational leaflets and print materials while standing on the public sidewalks and streets in front of its Outreach Center and [the] Planned Parenthood [clinic]."  (*Id.* at ¶¶ 29–31.)  When engaging in their advocacy, "Right to Life staff and volunteers stand and walk with their signs on the public sidewalks or near the edge of the Outreach Center's parking lot, always within 100 feet of [the] Planned Parenthood [clinic]," and they "are often within 30 feet of vehicle occupants entering and exiting" the Planned Parenthood clinic's parking lot and within 30 feet of pedestrians walking to the clinic from a nearby bus stop.  (*Id.* at ¶¶ 40–42.)  The staff and volunteers approach individuals arriving at the Planned Parenthood clinic, in vehicles or on foot, and "attempt to engage with them at a normal conversational distance, in order to offer print materials and to explain the help and support that Right to Life can provide."  (*Id.* at ¶ 43.)  When the approached individuals agree to continue the conversation, the staff and volunteers often invite them into the Outreach Center, which has additional written materials available and a private sitting area.  (*Id.* at ¶¶ 45–47.)

Right to Life participates in a "40 Days for Life" campaign, a biannual event during which outreach efforts are increased with additional sidewalk advocates and counselors serving shifts and holding around-the-clock prayer vigils outside abortion facilities.  (*Id.* at ¶¶ 48, 50.)  The 40 Days for Life fall campaign runs from September 22 through October 31, 2021.  (*Id.* at ¶ 49.)

Due to the state's passage of SB 742 on October 8, 2021 to prohibit certain free-speech activities within 100 feet of vaccination sites, Right to Life has suspended its outreach efforts, including its sidewalk advocacy during the remaining days of the 40 Days for Life campaign.  (*Id.* at ¶¶ 56, 58.)  To avoid violating SB 742 and incurring criminal penalties, plaintiff "has not and will not engage in certain protected speech, such as walking toward individuals on a public

sidewalk while carrying a sign, when that individual is within 30 feet and appears to be entering or exiting" the Planned Parenthood clinic. (*Id.* at ¶ 94.) Plaintiff alleges that "[i]f not for SB 742, Right to Life and its agents, including its staff and volunteers, would freely engage in protected speech, without hesitancy or fear of government punishment." (*Id.* at ¶ 90.)

As for the distance restrictions imposed by SB 742, Right to Life alleges that "30 feet is not a normal conversational distance." (*Id.* at ¶ 44.) Mr. Gerardi declared that "[i]t is exponentially more difficult to convince a passerby to take literature when it requires them to walk several yards to grab the leaflet, as opposed to a simple arm's reach," and "[m]ost people will not take a leaflet or flier unless they are approached and it is directly handed to them." (Doc. No. 11-2 at ¶ 7.) In addition, Mr. Gerardi has declared that during their advocacy, Right to Life staff and volunteers display signs with lettering that is an average of 3–4 inches high, and the "signs are much more difficult to read from a distance of 30 feet." (*Id.* at ¶¶ 5–6.) In addition, given the proximity of the Outreach Center to the Planned Parenthood clinic next door, the 100-foot zone extends onto Right to Life's own private property, and thus SB 742 prohibits Right to Life's expressive activity on its own private property and parking lot. (Doc. No. 1 at ¶¶ 4, 88, 97, 108.)

Based on the above allegations, plaintiff brought this pre-enforcement federal civil rights action challenging SB 742 (California Penal Code § 594.39) as an unconstitutional restriction on "speech based on content and viewpoint in public fora, by creating floating 30-foot bubble zones around persons within 100 feet of and seeking to enter or exit any facility that provides any type of vaccine." (*Id.* at ¶ 1.) "To stop the imminent irreparable harm to its constitutional rights," plaintiff requests that the court enjoin defendant from enforcing SB 742 (California Penal Code § 594.39). (*Id.* at ¶ 5.)

## LEGAL STANDARD

The standard governing the issuing of a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction. *See Stuhlbarg Intern. Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the

merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'") (quoting *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). The Ninth Circuit has also held that an "injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for Wild Rockies*, 632 F.3d at 1134–35 (quoting *Lands Council v. McNair*, 537 F.3d 981, 97 (9th Cir. 2008) (*en banc*)).[3] The party seeking the injunction bears the burden of proving these elements. *See Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009); *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.") Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

## ANALYSIS

Here, plaintiff seeks a temporary restraining order enjoining defendant Attorney General Bonta and any person acting in concert with him from enforcing SB 742. Below, the court will address whether plaintiff has satisfied each of the requirements for the issuance of the temporary restraining order which it seeks.

/////

/////

---

[3] The Ninth Circuit has found that this "serious question" version of the circuit's sliding scale approach survives "when applied as part of the four-element *Winter* test." *All. for the Wild Rockies*, 632 F.3d at 1134. "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. at 1135.

1    **A.    Likelihood of Success on the Merits**

2        Plaintiff contends that it is likely to succeed on the merits of the first four causes of action

3    asserted in its complaint.  (Doc. No. 11-1 at 9–21.)  Plaintiff does not address its likelihood of

4    success on the merits as to its fifth and final cause of action for an alleged violation of its First

5    Amendment right to expressive association.  Because, as explained below, the court finds that

6    plaintiff has shown a likelihood of success on its First Amendment freedom of speech claim and

7    will grant its request for temporary injunctive relief on that basis, the court will not address the

8    parties' arguments with regard to plaintiff's other claims in this order.[4]

9        1.    First Amendment Freedom of Speech Claim

10       "The First Amendment, applicable to the States through the Fourteenth Amendment,

11   prohibits laws that abridge the freedom of speech."  *Nat'l Inst. of Family & Life Advocates v.*

12   *Becerra*, ––– U.S. ––––, 138 S. Ct. 2361, 2371 (2018).  "The protections afforded by the First

13   Amendment are nowhere stronger than in streets and parks, both categorized for First

14   Amendment purposes as traditional public fora."  *Berger v. City of Seattle*, 569 F.3d 1029, 1035–

15   36 (9th Cir. 2009).  Public ways, sidewalks, and streets "have developed as venues for the

16   exchange of ideas," and "[s]uch areas occupy a 'special position in terms of First Amendment

17   protection' because of their historic role as sites for discussion and debate."  *McCullen v.*

18   *Coakley*, 573 U.S. 464, 476 (2014) (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)).

19   The government's right to limit expressive activity in a public forum "is 'sharply

20   circumscribed."  *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1145 (9th Cir.), *amended by*, 160

21   /////

22

23   _____

   [4]  The court does note, nonetheless, that plaintiff's other claims appear to have substantial merit

24   because they too are premised on SB 742's prohibition on certain speech activities (including
     plaintiff's religiously-motivated expressive activity) and its exemption for labor picketing (a

25   secular activity).  *See Tandon v. Newsom*, ––– U.S. ––––, 141 S. Ct. 1294, 1296 (2021) (citing
     *Roman Cath. Diocese of Brooklyn v. Cuomo*, ––– U.S. ––––, 141 S. Ct. 63, 67–68 (2020)

26   ("[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict
     scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity

27   more favorably than religious exercise."); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92,
     101 (1972) ("The Equal Protection Clause requires that statutes affecting First Amendment

28   interests be narrowly tailored to their legitimate objectives.").

1   F.3d 541 (9th Cir. 1998) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37,

2   45 (1983)).

3        Under the First Amendment, a government "has no power to restrict expression because

4   of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz*., 576

5   U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95 (1972)).

6   "Government regulation of speech is content based if a law applies to particular speech because

7   of the topic discussed or the idea or message expressed." *Id.* To determine whether a law is

8   content based, i.e., a law that targets speech based on its communicative content, courts consider

9   "whether a regulation of speech 'on its face' draws distinctions based on the message a speaker

10  conveys." *Recycle for Change v. City of Oakland*, 856 F.3d 666, 670 (9th Cir. 2017) (citing

11  *Reed*, 576 U.S. at 163). "A law that is content based on its face is subject to strict scrutiny

12  regardless of the government's benign motive, content-neutral justification, or lack of 'animus

13  toward the ideas contained' in the regulated speech." *Reed*, 576 U.S. at 165 (quoting *Cincinnati

14  v. Discovery Network, Inc.,* 507 U.S. 410, 429 (1993)). Courts consider whether a law is content

15  based or content neutral "on its face *before* turning to the law's justification or purpose," because

16  a government's assertion of "an innocuous justification cannot transform a facially content-based

17  law into one that is content neutral." *Reed*, 576 U.S. at 167.

18       "[T]he appropriate level of scrutiny is initially tied to whether the statute distinguishes

19  between prohibited and permitted speech on the basis of content." *Frisby v. Schultz,* 487 U.S.

20  474, 481 (1988). Content-based laws are "presumptively unconstitutional." *Reed*, 576 U.S. at

21  163. To overcome this presumption, a content-based law must survive strict scrutiny, which

22  requires the government to prove that the content-based law is "narrowly tailored to serve

23  compelling state interests." *Id.* In contrast, content-neutral restrictions on speech (reasonable

24  time, place, and manner restrictions that are justified without reference to the protected speech's

25  content") must be "narrowly tailored to serve a significant government interest, leaving open

26  ample alternative channels of expression." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784,

27  792 (9th Cir. 2006) (citing *Clark v. Cmty. for Creative Non-Violence,* 468 U.S. 288, 293 (1984)).

28  /////

This tailoring requirement guards not only against "an impermissible desire to censor" based on disagreeable content but also against a government conveniently silencing speech as "the path of least resistance" in addressing associated problems. *McCullen*, 573 U.S. at 486. "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.* (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). The closeness of the fit required depends on whether the restriction on speech is content based or content neutral.

For a content-based restriction to be narrowly tailored, the government "must demonstrate that its law is necessary to serve the asserted [compelling] interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992). "[T]he 'danger of censorship' presented by a facially content-based statute requires that that weapon be employed only where it is '*necessary* to serve the asserted [compelling] interest.'" *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 395 (1992) (quoting *Burson*, 504 U.S. at 199). "The existence of adequate content-neutral alternatives thus 'undercut[s] significantly' any defense of such a statute." *Id.* (quoting *Boos v. Barry*, 485 U.S. 312, 329 (1988) ("[T]he availability of alternatives . . . amply demonstrates that the display clause is not crafted with sufficient precision to withstand First Amendment scrutiny. It may serve an interest in protecting the dignity of foreign missions, but it is not narrowly tailored; a less restrictive alternative is readily available.")); *see, e.g., Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 747 (9th Cir. 2012) (law forbidding political parties from endorsing judicial candidates was not narrowly tailored because less restrictive and content-neutral alternatives were available). In other words, "a content-based regulation of constitutionally protected speech must use the least restrictive means to further the articulated interest." *Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998), *as amended on denial of reh'g* (July 29, 1998) (citing *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) ("It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends.")).

For content-neutral time, place, and manner restrictions to be narrowly tailored, the restriction "must not burden substantially more speech than is necessary to further the

12

1   government's legitimate interests," but unlike a content-based restriction, it "need not be the least

2   restrictive or least intrusive means of serving the government's interests.  *McCullen*, 573 U.S. at

3   486 (citation and internal quotations marks omitted).  However, even under this less stringent

4   tailoring standard, the government still "may not regulate expression in such a manner that a

5   substantial portion of the burden on speech does not serve to advance its goals."  *Ward v. Rock*

6   *Against Racism*, 491 U.S. 781, 799 (1989).

7              a.      *Whether SB 742 is a Content-Based Restriction on Speech*

8          Plaintiff argues that SB 742 is content based because it prohibits plaintiff and other

9   speakers from engaging in several forms of protected free speech in "quintessential public fora,"

10  but it expressly allows people to "engage in lawful picketing arising out of a labor dispute."  (*See*

11  Doc. No. 11-1 at 10.)  Plaintiff characterizes this provision as an "exemption," exempting labor

12  speech and expressive activity from the prohibitions in SB 742, while prohibiting speech on non-

13  labor topics.  (*Id.* at 6, 10.)  In particular, plaintiff explains that the 30-foot floating zone imposed

14  by the provision "radically hampers" their "quintessential expressive activity" of speaking in a

15  conversational tone and volume to offer support and information, carrying positive and

16  encouraging signs to attract attention, and handling out leaflets.  (*Id.* at 11–12.)  Plaintiff

17  emphasizes that the First Amendment protects their "right . . . to reach the minds of willing

18  listeners, and to do so there must be an opportunity to win their attention."  (*Id.* at 10–11) (citing

19  *Hill*, 530 U.S. at 728).  Plaintiff argues that SB 742 interferes with its opportunity to win the

20  attention of others because its staff and volunteers would have to shout from 30 feet away, which

21  distracts from and contradicts Right to Life's peaceful and calm messaging.  (*Id.* at 11.)  In

22  addition, plaintiff avers that its signs are more difficult to read from 30 feet away, thereby

23  weakening or suppressing their messages entirely, because staff and volunteers are prohibited by

24  SB 742 from walking towards someone to display the sign to that person from a distance any

25  closer than 30 feet.  (*Id.*)  According to plaintiff, SB 742 also inhibits their ability to pass out

26  pamphlets and leaflets and offer literature because "it is exponentially more difficult for a

27  passerby to take educational literature when it requires traveling several yards to grab the leaflet,

28  /////

13

as opposed to a simple arm's reach," and again, because its staff cannot approach any closer than 30 feet away from those passing by.  (*Id.* at 12.)

In his opposition, defendant does not contest that the expressive activity plaintiff has described is protected speech under the First Amendment.  Rather, defendant asserts that plaintiff is mistaken in its interpretation of SB 742 as exempting labor picketing.  (Doc. No. 15 at 13.) According to defendant's interpretation of SB 742, "picketing"—on any topic—is not prohibited at all.  (*Id.* at 13–15.)  According to defendant, the provision in SB 742 which states that "[i]t is not a violation of this section to engage in lawful picketing arising out of a labor dispute" is merely a simple clarification, not an exemption.  (*Id.*)  Defendant stops short of explaining why such a clarification would be needed if SB 742 cannot be construed as prohibiting "picketing" activities, despite SB 742's uncommon[5] definition of "harassing."  Defendant apparently sees a clear delineation, with no overlap, between "picketing" and "knowingly approaching, . . . for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with, that other person in a public way or on a sidewalk area."  Cal. Penal Code § 594.39(c)(1).

To support his view of the meaning of "picketing" as it appears in the statute, defendant first points to the dictionary definition of "picketing" used by the Third Circuit in *Bruni v. City of Pittsburgh*, 941 F.3d 73 (3d Cir. 2019).  In *Bruni*, the Third Circuit narrowly construed an ordinance that made it unlawful to "congregate, patrol, picket, or demonstrate" around a 15-foot buffer zone at the entrance of healthcare facilities, as an ordinance that does not prohibit "sidewalk counseling" in one-on-one conversations at a normal conversational volume and distance.  941 F.3d at 77, 86, *cert. denied sub nom. Bruni v. City of Pittsburgh, Pennsylvania*, ——

---

[5]  The Merriam-Webster Online Dictionary defines "harass" as:  "to annoy or bother (someone) in a constant or repeated way; to make repeated attacks against (an enemy); to exhaust, fatigue; to annoy persistently; to create an unpleasant or hostile situation for, especially by uninvited and unwelcome verbal or physical conduct; to worry and impede by repeated raids."  Merriam–Webster, http://www.merriam-webster.com/dictionary/harass (last visited October 26, 2021). Thus, SB 742's definition of harassing encompasses conduct that is obviously different than what people usually think of as harassing conduct and is far broader than the dictionary definition of the word "harass."

14

1  U.S. ——, 141 S. Ct. 578 (2021) (noting the dictionary definition of to "picket" is to "serve as a

2  picket," defined as "a person posted for a demonstration or protest").  In *Bruni*, however, the

3  Third Circuit noted that its limiting construction of the ordinance in that manner was counseled

4  by the doctrine of constitutional avoidance, so that the ordinance did "not sweep in the 'one-on-

5  one communication,' including 'normal conversation and leafletting,' that . . . 'have historically

6  been more closely associated with the transmission of ideas.'"  *Id.* at 90 (citing *McCullen*, 573

7  U.S. at 488).  The Third Circuit specifically concluded that the ordinance, which "sa[id] nothing

8  about leafletting or peaceful one-on-one conversations," was "readily susceptible to a narrowing

9  construction," and "under the doctrine of constitutional avoidance, it has long been a tenet of First

10 Amendment law that in determining a facial challenge to a statute, if it be readily susceptible to a

11 narrowing construction that would make it constitutional, it will be upheld."  (*Id.* at 85–86)

12 (citation and internal quotation marks omitted).  In short, the Third Circuit narrowly construed an

13 ordinance so that it did not prohibit "speech entitled to the maximum protection afforded by the

14 First Amendment," thereby avoiding constitutionality problems.  (*Id.* at 85–87).  But the question

15 presented here is not whether the court can or should construe SB 742 as prohibiting the highly-

16 protected "sidewalk counseling" type of speech—it already does so, explicitly.  Unlike in *Bruni*,

17 SB 742 specifically prohibits the speech that the court in *Bruni* found to be worthy of the highest

18 constitutional protections.  Accordingly, this court cannot similarly apply constitutional

19 avoidance principles to save SB 742 from constitutional challenge.  Consideration of the decision

20 in *Bruni* simply does not advance defendant's argument in this case.

21         Defendant next points to the original version of SB 742, which prohibited "picketing

22 targeted at a vaccination site."  (Doc. No. 15 at 13.)  Defendant contends that because this

23 provision was removed in a later version of the bill, the legislature recognized a distinction

24 between "picketing" and the conduct ultimately prohibited by the enacted version of SB 742.

25 (*Id.*)  However, the court notes that the earlier version of the bill that defendant references did not

26 include a prohibition on "harassing," with its uncommon definition, and that version did not

27 include the labor picketing provision either.  As a result, discerning the Legislature's intent from

28 the comparison that defendant highlights is neither straightforward nor convincing.  Moreover, in

15

1 the earlier version of the bill that prohibited "picketing targeted at a vaccination site," the term

2 "picketing" was defined as "as protest activities engaged in by a person within 300 feet of a

3 vaccination site." (Doc. No. 15-1 at 6.)  That is, when the Legislature used the word "picketing"

4 in a prior version of the bill, it explicitly meant "protest activities."  Yet SB 742, as enacted,

5 prohibits knowingly approaching someone for the purpose of "engaging in oral protest."  *See* Cal.

6 Penal Code § 594.39(c)(1).  For that reason, the court is not persuaded by defendant's argument

7 that there is no overlap between "picketing" and the activities prohibited by SB 742 (such as oral

8 protest).  Nor is the court persuaded by defendant's argument that prior versions of SB 742

9 somehow confirm that SB 742 as enacted clearly allows all picketing on any topic, and that the

10 labor picketing provision is a mere clarification.

11          Additionally, as plaintiff argues in its reply to defendant's opposition, defendant's

12 interpretation of that provision ignores the canon of statutory interpretation that requires statutes

13 to be construed so as to give effect to all provisions and avoid rendering any provisions

14 superfluous.  (Doc. No. 17 at 8) (citing *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 817

15 (2018) (noting that "one of the most basic interpretive canons is that a statute should be construed

16 so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void,

17 or insignificant")).  If all picketing is allowed by SB 742, then there would be no need for this

18 labor picketing provision at all; if the Legislature wanted to clarify that "lawful picketing" is

19 allowed—as defendant suggests (*see* Doc. No. 15 at 13)—there would be no need for the latter

20 half of the provision singling out picketing "arising out of a labor dispute."  For this additional

21 reason, the court is not persuaded by defendant's strained interpretation of the labor picketing

22 provision.

23          In the court's view, plaintiff is very likely to succeed in showing that SB 742 is content

24 based.  By its terms, SB 742 prohibits a person from knowingly approaching another person for

25 the purpose of engaging in "oral protest"—*unless* that oral protest is about a labor dispute.  The

26 statute also prohibits a person from knowingly approaching another person for the purpose of

27 displaying a sign to that person—*unless* that sign is held by a picketer displaying speech about a

28 labor dispute.

Accordingly, plaintiff has shown that it will likely succeed in establishing that SB 742 is a content-based restriction on speech and is thus subject to strict scrutiny.

           b.    *Whether SB 742 is Narrowly Tailored to Serve a Compelling State Interest*

The court notes that defendant addresses only whether SB 742 satisfies intermediate scrutiny as a content-neutral time, place, and manner restriction on speech.  (Doc. No. 15 at 16.) Defendant did not argue in the alternative that, if the court were to find that SB 742 is content based, SB 742 nevertheless satisfies strict scrutiny.  (*Id.*)

           i.    Whether Ensuring Access to All Vaccinations is Compelling

As noted above, in enacting SB 742, the Legislature declared that "[t]o blunt and stop infectious diseases, the State of California has an overwhelming and compelling interest in ensuring its residents can obtain and access vaccinations."  2021 Cal. Legis. Serv. Ch. 737, § 1(a)(9).  The Legislature also found and declared that "[p]rotestors at vaccination sites continue to impede and delay Californians' ability to access vaccination sites."  *Id.* § 1(a)(12).

Plaintiff does not directly refute this stated interest.  Rather, plaintiff argues that "[e]ven if such a broad aspiration for public health could ever be a compelling government interest, it is not one here, where the government is allowing other activity to undermine the interest while at the same time insisting on regulating speech."  (Doc. No. 11-1 at 13.)  In particular, through the labor picketing provision, SB 742 permits "massive labor protests to congregate outside as many vaccination sites as union workers would like—even just a few feet from the doors."  (*Id.*)  To the extent the state is concerned with the spread of disease, plaintiff argues that the state undercut that interest by rescinding other measures directed toward preventing the spread of COVD-19 before enacting SB 742.  (*Id.*)  Plaintiff contends, for example, that "three months before signing SB 742 into law, Governor Newsom lifted the remaining statewide orders on physical-distancing and crowd-capacity limits," and acknowledged "the successful and ongoing distribution of COVID-19 vaccines;" while making no comment suggesting that the exercise of free speech was inhibiting access to the vaccines.  (*Id.* at 13–14.)

Defendant does not address whether the state's interest in protecting access to vaccines is compelling; he argues only that it is "significant."  (Doc. No. 15 at 16.)

1    Nevertheless, the court recognizes, and indeed the Supreme Court has held, that

2    "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Cath.*

3    *Diocese of Brooklyn v. Cuomo*, ––– U.S. ––––, 141 S. Ct. 63, 67 (2020).  In addition, defendant

4    submitted as exhibits in support of its opposition to the pending motion several reports from the

5    U.S. Centers for Disease Control and Prevention ("CDC"), documenting that "COVID-19

6    vaccines are a key component in controlling the COVID-19 pandemic."  (Doc. No. 15-1 at 25–

7    69.)  Against this backdrop, there can be no doubt that access to COVID-19 vaccines is essential

8    to "stemming the spread of COVID-19," and that a state's interest in ensuring its citizens can

9    access and obtain COVID-19 vaccinations is compelling.  What is less clear—and what defendant

10   does not address, through argument or evidence—is whether the state has shown that it has a

11   compelling interest in ensuring access to *all* vaccinations, not just COVID-19 vaccinations.

12   Nonetheless, resolution of plaintiff's pending motion does not hinge on whether plaintiff is likely

13   to show that the Legislature's interest in passing SB 742 falls short of being a compelling interest.

14   Even assuming that the state's interest in ensuring Californians "can obtain and access

15   vaccinations" is a compelling interest—an assumption this court would readily make with regard

16   to access to COVID-19 vaccinations given this ongoing public health crisis and global

17   pandemic—plaintiff has shown that it is likely to succeed in proving that SB 742 is not narrowly

18   tailored to serve that interest.

19                      ii.     Whether SB 742 is Narrowly Tailored

20        Plaintiff argues that SB 742 is not narrowly tailored because it is both overbroad in that it

21   prohibits speech beyond what Supreme Court precedent on buffer zones allow, and it is

22   underinclusive in that it allows labor picketing—an activity that poses no less of a risk of

23   endangerment to its stated interest.  (Doc. No. 11-1 at 14.)  Plaintiff emphasizes that even under

24   the less stringent standard of intermediate scrutiny, the Supreme Court has struck down:  a 15-

25   foot buffer zone around people entering and leaving abortion clinics that prevented

26   "communicating a message from a normal conversational distance or handing leaflets to people

27   entering or leaving the clinics who are walking on the public sidewalks," *Schenck v. Pro-Choice*

28   *Network of W. New York*, 519 U.S. 357, 377 (1997); and a 35-foot buffer zone around an entrance

1   or exit to a reproductive health care facility that stifled messaging "through personal, caring,

2   consensual conversations," emphasizing that "when the government makes it more difficult to

3   engage in these modes of communication, it imposes an especially significant First Amendment

4   burden," *McCullen v. Coakley*, 573 U.S. 464, 489 (2014).  (Doc. No. 11-1 at 14–15.)  In those

5   cases, the asserted state interest was similarly to ensure access to those facilities.  But the

6   Supreme Court found that those buffer zone laws were too broad and placed too much of a burden

7   on fundamental protected speech, and thus struck them down as not being narrowly tailored to the

8   state's interest.  In light of these precedents, plaintiff contends SB 742 is unquestionably

9   overbroad and insufficiently tailored to survive strict scrutiny, in large part because a 30-foot

10  floating buffer zone makes one-on-one conversations impossible and requires shouting that is

11  "starkly at odds with the message [plaintiff] communicates," and importantly, because defendant

12  has not provided any evidence or argument suggesting that the speech prohibited by SB 742

13  causes or contributes to the harm that it seeks to prevent (i.e., obstruction of access).  (Doc. No.

14  17 at 6.)  Finally, plaintiff notes that there are several readily available and less restrictive

15  alternatives to achieving the stated interest, yet the state has not tried to employ them, seriously

16  considered them, or explained why they would not be expected to work, all of which is required

17  to show that a law is narrowly tailored.  (Doc. No. 17 at 9–12) (*see McCullen*, 573 U.S. at 494

18  (finding that "the Commonwealth has not shown that it seriously undertook to address the

19  problem with less intrusive tools readily available to it.  Nor has it shown that it considered

20  different methods that other jurisdictions have found effective")).

21         In opposition, defendant mounts a confusing and ultimately unpersuasive argument—

22  which defense counsel appeared to abandon at the hearing on the pending motion—that any

23  imposition on plaintiff's protected speech here is minimal and limited because, according to

24  defendant's interpretation of SB 742, plaintiff and any other speaker can engage in conversation,

25  leafletting, displaying a sign, protesting, counseling, etc., (all the activities prohibited under SB

26  742's definition of "harassing") so long as they do so while standing still.  (Doc. No. 15 at 17–

27  22.)  In defendant's opposition brief, he vaguely references the ability of any speaker to stand "in

28  the vicinity" and "near" the clinic entrance and freely pass out leaflets to those "passing by" or

19

1    initiate consensual conversations with those who "pass by." (*Id.*)  Defendant also contends that

2    plaintiff's staff members are not prohibited "from standing on plaintiff's property" with signs.

3    (*Id.* at 18.)  To add to the confusing nature of defendant's argument in this regard, defendant

4    states that all persons are allowed to march back and forth, while holding signs—presumably to

5    bolster his argument that all picketing is allowed.  (*Id.*)  But as plaintiff points out in its reply,

6    "defendant does not try to explain how [Right to Life] speakers can hold signs while walking or

7    marching back and forth on a narrow sidewalk and not approach within 30 feet of a passerby."

8    (Doc. No. 17 at 13.)

9        At the hearing on the pending motion, defense counsel appeared to abandon the "standing

10   still" argument to an extent, and instead asserted that under the statute people are free to be

11   anywhere within the buffer zone (standing, sitting, or walking around), and can display signs or

12   handout pamphlets as long as they do not "approach" by taking a step towards the other person or

13   walking towards another person.  Defense counsel explained at the hearing that under defendant's

14   view, a person could "walk back and forth along the sidewalk and offer pamphlets to people

15   passing by"—a view that seems squarely contradicted by the very text of SB 742.  Defense

16   counsel also took the position at the hearing that if an individual is sitting at a table with

17   pamphlets, and the individual stands up and leans over the table to hand another person a

18   pamphlet, that would not be considered "an approach" in violation of the statute.  According to

19   defendant, the Legislature was concerned with the act of "walking towards" another, and it was

20   that conduct that the Legislature meant by the phrase "knowingly approach."  At a minimum,

21   defendant's shifting and morphing arguments demonstrate that SB 742 is so vague that it is

22   conducive to different and conflicting interpretations on what conduct is even prohibited by its

23   terms.

24       As for application of Supreme Court precedent, defendant attempts to distinguish the 30-

25   foot floating buffer zone created by SB 742 from the buffer zones stricken down in *McCullen* and

26   *Schenck* by emphasizing that speakers in those cases could not cross a fixed boundary, whereas

27   under SB 742, speakers are permitted to go anywhere within the 100-foot zone, stand still in their

28   spot (or "walk around" according to defense counsel's latest argument) and engage passersby as

1    long as they do not approach those who pass by.  (Doc. No. 15 at 19–21.)  Defendant essentially

2    argues that SB 742 does not substantially burden plaintiff's ability to have one-on-one

3    conversations because they can initiate encounters with passersby while standing still (or walking

4    around), obtain consent to continue the conversation, and then move freely within the zone while

5    having that consensual conversation.  (*Id.*)

6          Defendant also relies on the Supreme Court's decision in *Hill v. Colorado*, in which the

7    Court upheld a statute that prohibited a person within 100 feet of an entrance to a health care

8    facility from knowingly approaching within 8 feet of another person to pass "a leaflet or handbill

9    to, displa[y] a sign to, or engag[e] in oral protest, education, or counseling with [that] person."

10   (Doc. No. 15 at 19); *Hill v. Colorado*, 530 U.S. 703, 707 (2000).  Defendant argues that like the

11   statute in *Hill*, SB 742 allows a speaker "to remain in one place" and not violate the statute even

12   if passersby happen to come within 30 feet of the speaker who is standing.  (*Id.*)  But defendant's

13   argument ignores the Supreme Court's reasoning in *Hill*.  Namely, the Court explained that

14   "[u]nlike the 15-foot zone in *Schenck*, this 8-foot zone allows the speaker to communicate at a

15   'normal conversational distance.'"  *Hill*, 530 U.S. at 726–27.  Defendant does not address

16   plaintiff's common-sense argument that 30 feet is clearly not a conversational distance.

17   Moreover, defendant overlooks the Court's analysis in *Hill* with respect to leafletting, wherein the

18   Court noted that "[t]he burden on the ability to distribute handbills is more serious because it

19   seems possible that an 8-foot interval could hinder the ability of a leafletter to deliver handbills to

20   some unwilling recipients," but ultimately concluded that passing pedestrians can easily accept a

21   proffered pamphlet from an 8-foot distance.  *Hill*, 530 U.S. at 727.  The same cannot reasonably

22   be said of a distance of 30 feet as imposed by this statute.  Indeed, plaintiff asserts that

23   "[n]avigating around a 30-foot bubble on a public sidewalk (or even on [plaintiff's] own

24   property) to position oneself so that persons entering a vaccination site will pass close enough to

25   engage in quiet conversation or accept a leaflet is far more difficult" than the maneuvering with

26   the smaller 8-foot buffer zone permitted in *Hill*.  (Doc. No. 17 at 6.)  At the hearing on the

27   pending motion, defendant countered plaintiff's argument and suggested that individuals can

28   walk around and be closer than 30 feet from another person, and even hand them a pamphlet or

1  display a sign to them, but only if they do not "knowingly approach" that person to hand them

2  that pamphlet or display that sign.  This strained interpretation is at best confusing and at worst

3  frivolous in the undersigned's view.  For these reasons, the court is not persuaded by defendant's

4  argument that SB 742 can and should be deemed narrowly tailored based upon the Supreme

5  Court's decision in *Hill*.

6      For the reasons explained above, the court concludes that plaintiff is likely to show that

7  SB 742 is not narrowly tailored to serve the state's interest of ensuring access to vaccination sites.

8  Thus, plaintiff has shown a likelihood of success on the merits of its First Amendment freedom of

9  speech claim.

10  **B.      Irreparable Harm**

11      Having found that plaintiff has shown a likelihood of success on the merits of its First

12  Amendment freedom of speech claim, the court now turns to the likelihood that plaintiff will

13  suffer irreparable harm in the absence of the granting of preliminary injunctive relief.  The risk of

14  irreparable harm must be "likely, not just possible." *All. for the Wild Rockies*, 632 F.3d at 1131.

15  "Speculative injury does not constitute irreparable injury sufficient to warrant granting a

16  preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir.

17  1988).

18      "It is well established that the deprivation of constitutional rights 'unquestionably

19  constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)

20  (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  It is also well-settled that "[t]he loss of First

21  Amendment freedoms, for even minimal periods of time, 'unquestionably constitutes irreparable

22  injury.'" *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67 (quoting *Elrod*, 427 U.S. at 373).

23      Plaintiff argues that it has suffered and continues to suffer irreparable harm because SB

24  742 has deprived it of its constitutional rights.  (Doc. No. 11-1 at 21–22.)  Defendant does not

25  contest plaintiff's showing that it is likely to suffer irreparable harm in the absence of the granting

26  of preliminary injunctive relief.  (Doc. No. 15 at 8.)

27      As described above, plaintiff has shown a likelihood of success on the merits of its

28  constitutional claim, in which plaintiff alleges that defendant's enforcement of SB 742 deprives

1   plaintiff of its First Amendment rights to freedom of speech.  In addition, the court is persuaded

2   by plaintiff's argument that the irreparable harm caused to it by SB 742 is particularly acute

3   because "SB 742 came into effect in the middle of Right to Life's participation in the biannual 40

4   Days for Life campaign," which runs from September 22 through October 31, 2021, and plaintiff

5   "will never get back the opportunity to reach each woman who enters Planned Parenthood Fulton

6   during this time without hearing Right to Life's message."  (Doc. No. 11-1 at 8, 21–22.)

7          Thus, the court concludes that plaintiff has shown a likelihood that it will suffer

8   irreparable harm in the absence of the requested injunctive relief.

9   **C.     Balance of the Equities / Public Interest**

10         Courts "must balance the competing claims of injury and must consider the effect on each

11  party of the granting or withholding of the requested relief," and "should pay particular regard for

12  the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat.*

13  *Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "In assessing whether the plaintiffs have met this

14  burden, the district court has a duty to balance the interests of all parties and weigh the damage to

15  each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (internal quotation marks

16  and alteration omitted).  "Where the government is a party to a case in which a preliminary

17  injunction is sought, the balance of the equities and public interest factors merge." *Padilla v.*

18  *Immigr. & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020) (citing *Drakes Bay Oyster Co. v.*

19  *Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).

20         "Generally, public interest concerns are implicated when a constitutional right has been

21  violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*,

22  422 F.3d 815, 826 (9th Cir. 2005).  "It is always in the public interest to prevent the violation of a

23  party's constitutional rights." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838

24  (9th Cir. 2020) (citation omitted).  "When weighing public interests, courts have 'consistently

25  recognized the significant public interest in upholding First Amendment principles.'" *Id.* (citing

26  *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012)).

27         Plaintiff argues that the balance of the equities weighs in its favor because any potential

28  hardship on the state's interest in protecting access to vaccination sites for persons seeking to

1    receive the COVID-19 vaccine is outweighed by the harm of SB 742 chilling its First

2    Amendment rights.  (Doc. No. 11-1 at 22.)  Plaintiff emphasizes that courts often enjoin laws that

3    infringe on free speech rights by imposing criminal sanctions and chilling protected speech.  (*Id.*)

4    (citing *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (concluding that "the balance of equities

5    favors [plaintiffs], whose First Amendment rights are being chilled [and] [t]his is especially so

6    because the Act under scrutiny imposes criminal sanctions for failure to comply"); *Ashcroft v.

7    A.C.L.U.*, 542 U.S. 656, 670–71 (2004) ("Where a prosecution is a likely possibility, yet only an

8    affirmative defense is available, speakers may self-censor rather than risk the perils of trial.

9    There is a potential for extraordinary harm and a serious chill upon protected speech.")).  Here,

10   plaintiff has shown that its First Amendment activity has been—and continues to be—chilled by

11   SB 742 and fear of prosecution; plaintiff suspended its 40 Days for Life campaign and its

12   outreach efforts to approach women entering Planned Parenthood to engage them in conversation,

13   offer literature, and counseling.  (Doc. No. 11-1 at 21–23.)

14          In addition, plaintiff argues that "the potential chilling effect on non-parties also weighs

15   heavily in favor of finding that an injunction would be in the public interest," especially because

16   the extreme breadth of SB 742 "threatens to chill any speech (other than labor related speech)" by

17   any speaker who seeks to approach another person and "is within 100 feet of any business that

18   happens to provide a vaccine of any type."  (*Id.* at 23–24.)  Thus, according to plaintiff, the broad

19   speech restriction of SB 742 threatens the public interest and supports enjoining defendant from

20   enforcing SB 742, not just as applied to Right to Life, but as against any speaker.  (*Id.* at 22–24)

21   (citing *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (concluding that the

22   "balance of equities and the public interest thus tip sharply in favor of enjoining [an anti-litter]

23   ordinance" that prohibited leafleting on unoccupied parked vehicles because the ordinance

24   "infringes on the free speech rights not only of [plaintiff], but also of anyone seeking to express

25   their views in this manner in the city").

26          In its opposition, defendant focuses solely on the public interest factor and argues that the

27   requested temporary restraining order is not in the public interest.  (Doc. No. 15 at 8, 24–26.)

28   According to defendant, "SB 742 imposes minimal restrictions on plaintiff's expressive activities

                                                     24

1  while serving critical public health purposes during the ongoing pandemic." (*Id.* at 25.)

2  Defendant notes that other courts have recognized "the importance of vaccines in halting the

3  spread of COVID-19," lending support to defendant's argument that orders and mandates that

4  "inhibit further vaccination are not in the public interest." (*Id.*)  Defendant also notes that access

5  to vaccines is a particularly important interest at this time because "vaccination rollout for

6  children under 12 will soon begin and boosters for recipients of Moderna and Johnson & Johnson

7  vaccines have now been authorized, which will lead to an increased demand for vaccines." (*Id.* at

8  26.)  Defendant argues that the public interest "is furthered by ensuring that those who wish to

9  receive vaccines—whether for COVID-19 or otherwise—are able to physically access

10  vaccination sites and to do so without harassment, threats, physical assault, or intimidation." (*Id.*

11  at 25.)

12        In reply, plaintiff reiterates that defendant has not come forward with any evidence or

13  argument to support SB 742's restriction on speech within 100 feet of *all* vaccination sites, as

14  opposed to just COVID-19 vaccination sites.  (Doc. No. 17 at 13–14.)  Rather, defendant cites to

15  news reports of incidents in California at COVID-19 vaccination sites, including at Dodger

16  Stadium in January 2021.  (*Id.*)  Plaintiff urges the court to find that such limited factual support

17  does "not justify an unprecedented restriction on speech on public and private property near all

18  California vaccination sites." (*Id.* at 14.)

19        The court does not take consideration of the issues presented in this case lightly,

20  particularly as it concerns the public interest in combatting the deadly COVID-19 pandemic,

21  which has wreaked havoc around the world including California.  Availability and access to the

22  lifesaving COVID-19 vaccines are of paramount importance in this ongoing fight against

23  COVID-19 and to prevent the spread of this highly contagious and lethal virus.  Despite these

24  undeniable facts, the court recognizes that the COVID-19 vaccines have been a subject of

25  controversy and protest, as defendant highlights in his opposition brief and as reported in the

26  news articles cited therein.  (See Doc. No. 15 at 7, 9–10.)  The Legislature's concerns about the

27  harms it sought to address in enacting SB 742 are well-founded and worthy of the effort.

28  Nonetheless, under the legal standards applicable to the pending motion, it is clear that plaintiff

1   has satisfied its burden to show that the balance of the equities and public interest weighs in its

2   favor in this case.  Accordingly, the court will grant plaintiff's pending motion, in part, and issue

3   a temporary restraining order that provides limited injunctive relief, enjoining enforcement of

4   only the provision of SB 742 that is causing plaintiff ongoing irreparable harm.

5   **D.      Scope of the Injunction and Severability**

6          The court does not find that plaintiff has sufficiently supported its request for an

7   injunction that enjoins enforcement of SB 742 in its entirety, including its prohibitions on

8   obstructing, injuring, intimidating, or interfering; none of which are challenged by plaintiff.

9   Indeed, defendant urges the court to narrowly tailor any injunctive relief solely to enjoin the

10  portion of SB 742 that plaintiff has challenged here.  (Doc. No. 15 at 27) (citing *Stormans*, 586

11  F.3d at 1127 (noting that any injunctive relief "must be tailored to remedy the specific harm

12  alleged")).  Specifically, defendant asserts that any injunction issued in this case would need only

13  to enjoin enforcement of SB 742's prohibition on "harassing," which makes it unlawful to:

14           knowingly approach within 30 feet of any person while a person is
             within 100 feet of the entrance or exit of a vaccination site and is
15           seeking to enter or exit a vaccination site, or any occupied motor
             vehicle seeking entry or exit to a vaccination site, for the purpose of
16           . . . harassing, [defined as] . . . knowingly approaching, without
             consent, within 30 feet of another person or occupied vehicle for the
17           purpose of passing a leaflet or handbill to, displaying a sign to, or
             engaging in oral protest, education, or counseling with, that other
18           person in a public way or on a sidewalk area.

19  *See* Cal. Penal Code § 594.39.  To accomplish this, the term "harassing" would be deleted from

20  § 594.39(a), and the definition for "harassing" in § 594.39(c)(1) would also be deleted.

21         Defendant asserts that this portion of SB 742 is severable because "it represents a distinct

22  portion of SB 742 and can simply be deleted from the statute without impacting the remaining

23  prohibitions."  (Doc. No. 15 at 27–28.)  Thus, defendant contends that the court may grant this

24  narrow injunctive relief while leaving "the remainder of the statute intact and enforceable."  (*Id.*

25  at 28.)

26         Plaintiff does not address defendant's assertion, or otherwise address the prospect of a

27  narrowly tailored injunction, in its reply brief.  At the hearing on the pending motion, plaintiff

28  explained that although it believes an injunction of the entire statute is warranted, plaintiff would

26

1    not object to the limited injunction as proposed by defendant because that narrow relief would

2    sufficiently address the immediate harm plaintiff is suffering.

3          The court finds that a narrow injunction to enjoin enforcement of the "harassing"

4    provision of SB 742, codified in California Penal Code § 594.39(a), and as defined in California

5    Penal Code § 594.39(c)(1), is the appropriate preliminary relief in this case.  This narrow

6    injunction leaves in place SB 742's remaining prohibitions against "obstructing, injuring, . . . ,

7    intimidating, or interfering," all of which appear to more precisely target the harms that the

8    Legislature sought to prevent and further the state's interest in ensuring that Californians can

9    freely access vaccination sites.

10                                    **CONCLUSION**

11         For all of the reasons stated above:

12   1.    Plaintiff's motion for a temporary restraining order (Doc. No. 11) is granted, in

13         part.  The court orders that, pending a hearing on a motion for a preliminary

14         injunction,

15         a.    Defendant and any person acting in concert with him shall be restrained

16               and enjoined from enforcing SB 742's prohibition on "harassing" as that

17               term is defined in California Penal Code § 594.39, as applied to Right to

18               Life and its agents, and facially as to any speaker;

19   2.    No bond shall be required to be posted by plaintiff pursuant to Rule 65(c) of the

20         Federal Rules of Civil Procedure;

21   3.    The parties are directed to meet and confer and, if possible, submit a joint

22         proposed briefing schedule and hearing date with respect to any motion for a

23         preliminary injunction, with that proposed schedule being submitted to the court

24         no later than fourteen (14) days from the date of this order; and

25   /////

26   /////

27   /////

28   /////

27

4.       Defendant is further notified of his right to apply to the court for modification or dissolution of this temporary restraining order, if appropriate and supported by a showing of good cause, on two (2) days' notice or such shorter notice as the court may allow.  *See* Fed. R. Civ. P. 65(b)(4) and Local Rule 231(c)(8).

IT IS SO ORDERED.

Dated:   **October 30, 2021**

UNITED STATES DISTRICT JUDGE

28